**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DION ANTHONY JOHNSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of )<br>Social Security, )<br>)<br>Defendant. ) | Civil Action No. 15-423-GMS |

**MEMORANDUM**

### I. INTRODUCTION

This action arises from the denial of Dion Johnson's ("Johnson's") claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act on June 5, 2009. 42 U.S.C. §§ 401-433, 1381-1383f. Johnson applied for DIB and SSI on December 20, 2010, after sustaining gunshot wounds to his anterior abdomen and right knee area on May 5, 2009. (D.I. 9 at 370.) On May 26, 2015, after the Appeals Council denied Johnson's request for review on April 24, 2014, (*id.* at 4), Johnson commenced this civil action requesting judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3). (D.I. 2 at 1.)

Presently before this court are the parties' cross-motions for summary judgment. After considering the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes that the ALJ's decision was adequately supported by substantial evidence. Therefore, the court will: (1) deny the plaintiff's motion for summary judgment; and (2) grant the defendant's motion for summary judgment to affirm the denial of DIB and SSI.

## II. BACKGROUND

Johnson was born on October 16, 1984. (D.I. 9 at 223.) He has a GED, can read and write, and has past relevant work ("PRW") as a floor waxer. (*Id.* at 37.) He also possesses experience working as a cleaner, cook, cashier, and stocker. (*Id.* at 278.) "As a stocker and floor cleaner, he stated that he used technical knowledge/skills and wrote, completed reports, or performed similar duties." (D.I. 17 at 2.) Johnson's disability began on May 5, 2009, when at the age of 24, he "sustained multiple gunshot wounds, resulting in vascular and nerve injury and a comminuted proximal tibial fracture from which he eventually developed chronic pain syndrome and reflex sympathetic dystrophy." (D.I. 15 at 2.) "Among other limitations, his treating physician [Dr. Slack] opined that his chronic pain was likely to result in at least three work absences per month." (*Id.*)

The state agency denied Johnson's claims at the initial and reconsideration levels of administrative review. (D.I. 9 at 139, 144.) Upon Johnson's request, on September 4, 2012, an Administrative Law Judge ("ALJ") held a hearing, where both Johnson and a Vocational Expert ("VE") testified. (*Id.* at 40–63.) Although Johnson claimed to be unskilled and lack transferrable skills or direct entry education, (D.I. 18 at 2), the VE and ALJ relied on semi-skilled jobs to determine disability. (D.I. 9 at 38.) Johnson also introduced evidence from his family doctor, who indicated on a form that he would be expected to miss at least three days of work per month. (*Id.* at 548.) The ALJ accorded this evidence little weight. (*Id.* at 36.) Following the hearing, on November 9, 2012, the ALJ issued a decision finding that Johnson was not disabled under sections 216(i) and 223(d) of the Social Security Act, (*id.* at 39), and that he could find employment in many sedentary, semi-skilled jobs, such as telemarketing, reception, or check cashing. (*Id.* at 38.)

2

### A. Medical Evidence

To support his claim, Johnson produced medical records regarding the history and alleged progression of his symptoms. The court will summarize these records. On May 5, 2009, Plaintiff was rushed to Crozer Chester Medical Center after sustaining multiple gunshot wounds to his anterior abdomen and right knee area. (*Id.* at 370). X-rays revealed a fracture to the right tibial plateau area, "which necessitated surgical repair of the popliteal artery and screw fixation of the tibia." (D.I. 17 at 3.) "Post-surgical testing of his right leg veins on May 18, 2009 showed normal flow, compression, and augmentation." (*Id.*) Soon after his discharge from the hospital on June 1, 2009, Johnson returned several more times reporting continued pain.[1] (*Id.*) Other than treating an infection on June 10, 2009, (D.I. 9 at 333), Johnson's frequent hospital visits resulted in either negative results, (*id.* at 565), or discharge with pain medication. (*Id.* at 477.)

It was not until Johnson began seeing Dr. Melanie Slack in December of 2010, that results indicated mild atrophy of his right leg, compromising 1/5 of his leg's strength. (*See id.* at 506.) On January 11, 2011, Dr. Slack found "some strength and sensation deficits, but concluded that although plaintiff could no longer perform his old job as a carpet cleaner, he was 'able to work in other modalities- i.e. sitting.'" (D.I. 17 at 4.) On November 4, 2011, Johnson returned to Dr. Slack, who opined that he would need to be absent from work, due to his injury, three or more days per month. (*Id.* at 547.) On November 25, 2011, Johnson visited Dr. Slack to inform her about an issue with her latest treatment note, (*id.* at 554), but Dr. Slack insisted that the "'form was filled out correctly – he is not able to work in construction but he is not restricted from finding another occupation that does not require manual labor.'" (*Id.* at 555.)

---

[1] June 7, 2009; June 20, 2009; August 1, 2009; September 21, 2010; December 10, 2010; and December 14, 2010. (D.I. 17 at 3-4.)

3

When Johnson began treatment at Mid-Atlantic Spine, results revealed a "coordinated and smooth gait with stable ambulation while walking with a cane, 5/5 muscle strength in all extremities, and normal sensation, range of motion, and muscle tone." (Tr. 598); (D.I. 17 at 5.) On three additional occasions,[2] Johnson reported "intractable right leg pain" despite consistent reports of coordinated, smooth, and normal ambulation. (D.I. 17 at 5.)

### B. Hearing Testimony

#### 1. *Dion Johnson's Testimony*

At the hearing, Johnson testified that he was 27-years-old. (D.I. 9 at 44.) When asked about his education, Johnson told the court that he had obtained his GED and could read and write. (*Id.* at 45.) The ALJ then asked Johnson to discuss his previous employment with Golden Glow Carpet Cleaners, where he stripped and waxed floors at movie theaters. (*Id.*) To perform the necessary duties of this job, Johnson explained that he was required to lift at least 20 pounds, and was on his feet for the entire shift. (*Id.* at 46.) Johnson speculated that he was disabled because he lacked strength in his right leg and experienced constant pain. (*Id.*) He mentioned his frequent visits to his pain management doctor and his use of Tylenol with codeine to ease the pain, but stated that the discomfort still remained an eight out of ten, on a scale from one to ten. (*Id.* at 48.) Johnson reported that he was regularly attending therapy, but eventually stopped due to paroxysmal shaking. He said he still dealt with sudden onsets. (*Id.* at 49.) Johnson was prescribed a cane to assist in walking, but still described movement as difficult. (*Id.* at 51.) Johnson lives with his wife and two sons, ages nine months and five years and must have assistance from his brother when his wife goes to work. (*Id.* at 52–53.) When asked about his current seated position in the courtroom, Johnson claimed that he was "slanted on a lean"

---

[2] February 22, March 22, and April 19, 2012. (D.I. 17 at 5.)

because sitting up straight put too much pressure on his injured leg and he would have to reposition within a half an hour. (*Id.* at 56.)

### 2. *The Vocational Expert's Testimony*

The vocational expert ("VE") classified Johnson's previous work as equivalent to a "floor waxer" which carried a specific vocational preparation ("SVP") of three out of nine, placing him in the semi-skilled category. (*Id.* at 58.) The ALJ then gave the VE two hypotheticals. The ALJ first asked the VE:

> [T]o assume an individual of the claimant's age, education, and past work experience. For the first hypothetical, [] assume the individual can lift 10 pounds frequently, 20 pounds occasionally; the individual can sit for six hours in an eight hour workday; can stand or walk a combination total of three hours in an eight hour workday. The individual should not be exposed to hazards like climbing ladders, being around moving machinery, or unprotected heights, and the individual should not push or pull with the right lower extremity.

(*Id.* at 58.) The VE responded that Johnson would not be able to perform his previous job in floor construction, but offered three alternatives including telemarketing, reception, and check cashing. (*Id.* at 58–59.) For the second hypothetical the ALJ asked the VE to assume the same as above, but also that:

> This individual has the exertional capacity for sedentary work, and he needs to have the ability to change position from sitting to standing at will. The individual can occasionally climb stairs; not climb ladders, kneel, crouch, crawl; should not be around moving machinery or unprotected heights. Also should not push or pull with the lower extremities. The individual needs to walk with a cane.

(*Id.* at 59.) Just as above, the VE responded that Johnson would not be able to perform his previous job, but could apply to be a telemarketer, receptionist, or check casher. (*Id.*) The ALJ then inquired whether these jobs would permit absence more than one day a month. The VE responded no and that it "would preclude employment." (*Id.* at 60.) When told that Johnson's leg would need to be elevated while working, the VE claimed this would only eliminate one-third of the potential jobs he could apply to. (*Id.* at 60–61.)

5

## C. The ALJ's Findings

Under the Social Security Act, the Social Security Administration employs the following five-step sequential claim evaluation process to determine whether an individual is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the listing of impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. The claimant bears the burden of proof for steps one, two, and four of this test. The Commissioner bears the burden of proof for the last step.

*Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir. 2000) (internal quotations omitted). Based on the factual evidence and testimony of Johnson and the VE, the ALJ determined that Johnson was not disabled, and therefore not eligible for DIB or SSI. (*Id.* at 39.) The ALJ's findings are summarized as follows:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since May 5, 2009, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: status post gunshot wound to the right leg (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he requires the ability to change position from

6

sitting to standing at will; he can occasionally climb stairs; he cannot climb ladders, kneel, crouch, crawl, be exposed to moving machinery or unprotected heights, or push/pull with the lower extremities; he needs to walk with a cane.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was 24 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (Exhibits B1D and B2D; 20 CFR 404.1563 and 416.963).

8. The claimant has the equivalent of a high school education and is able to communicate in English (Hearing testimony; 20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 5, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

### III. STANDARD OF REVIEW

#### A. Review of the ALJ's Findings

To determine suitability of summary judgment in Social Security cases, a court must ascertain whether substantial evidence supports the Commissioner's decision and whether the ALJ correctly applied the law. 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion." (*Id.*) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564–65 (1988). "This Court must affirm the decision of the Commissioner if substantial evidence supports it, regardless of whether the Court would have decided the case differently had it been the trier of fact." (*Id.*) (quoting *Monsour*, 806 F.2d at 1191). Substantial evidence does not require "a large or

7

considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood,* 487 U.S. 552, 564–65 (1988). Hence, the only requirement, "is more than a mere scintilla of evidence but [] less than a preponderance." *Woody,* 859 F.2d at 1159. Since the role of the reviewing court is not to re-weigh evidence, *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n,* 869 F.2d 719, 753 (3d Cir. 1989), this court must affirm the decision of the Commissioner "if those inferences are supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" *Monsour Med. Ctr.,* 806 F.2d at 1191.

### IV. DISCUSSION

#### A. Determination of Vocational Expert Regarding Johnson's Specific Vocational Preparation

In making a SVP determination, "[a]bility to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work." SSR 83-10 (S.S.A. 1983). The plaintiff mentioned in his brief that he did not have any transferrable skills, nor did he have adequate education to qualify for direct entry skills. (D.I. 15 at 4.) Nonetheless, the VE classified Johnson as semi-skilled at a SVP level of three out of nine, (D.I. 9 at 58), and introduced three semi-skilled jobs to prove Johnson's marketability.

Johnson argues that according to agency code, work in floor construction is not transferrable and, having been removed from school for over ten years, he is not an ideal candidate for direct entry training. (*See* D.I. 15 at 4–5.) Defendant Social Security Administration responds that Johnson has a GED, can read and write, and possesses transferrable skills. Specifically, Johnson reported carrying several jobs prior to floor construction where he

8

used "technical knowledge/skills and wrote, completed reports, or performed similar duties." (D.I. 17 at 8.)

The VE placed Johnson's most recent work experience as a floor waxer, at a SVP level three, which translates to semi-skilled employment. SSR 00-4p, 2000 WL 1898704. According to the Dictionary of Occupational Titles ("DOT"), "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9." *Id.* When an individual has a level three semi-skilled ranking, it implies that the worker has transferrable skills, and may therefore transfer such skills between similar semi-skilled jobs. *See id.* Although Johnson argues he is not semi-skilled and does not possess transferrable skills, the court disagrees. If Johnson has a GED, can read and write, and has experience consisting of technical knowledge and duties, there is substantial evidence to conclude that he possesses transferrable skills and is semi-skilled as opposed to unskilled.

### B. Vocational Expert's Testimony of Available Work

The ALJ introduced two hypotheticals, both resulting in available sedentary work for Johnson. (D.I. 9 at 58–59.) If a "hypothetical [is] adequate, the vocational expert's testimony regarding other work provide[s] substantial evidence for the ALJ's conclusion." *McDonald v. Astrue*, 293 F. App'x 941, 947 (3d Cir. 2008). The VE also described the job outlook, disclosing thousands of employment opportunities in telemarketing, reception, and check cashing nationwide, as well as in the Philadelphia/Wilmington area. (D.I. 16 at 9.) The plaintiff argues that the jobs submitted by the VE were all semi-skilled, but the finding above makes this point moot. Although job availability will drop by one third if Johnson needs to elevate his leg while sitting, there are still an abundance of telemarketing, reception, and check cashing positions available in the Philadelphia/Wilmington area alone. (D.I. 9 at 60–61.) The court finds no reason to believe

the ALJ's hypotheticals were inadequate, and therefore the jobs produced by the VE may function as substantial evidence. Thus, there is substantial evidence that Johnson is semi-skilled, and and the VE's suggestion of three semi-skilled jobs was proper. " Where the ALJ's decision is supported by substantial evidence, it must be upheld." *O'Connor v. Comm'r Soc. Sec.*, 466 F. App'x 96, 99 (3d Cir. 2012).

### C. Medical Opinion of Dr. Slack

In regard to medical testimony, it is well established that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Although an ALJ may not "employ her own expertise against that of a physician who presents competent medical evidence," *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), the medical evidence will only be considered if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). If medical evidence conflicts with the physician's opinion, the ALJ may discount the opinion, so long as there is a reasonable explanation. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007).

Johnson's primary concern is that the ALJ did not provide a reasonable explanation for rejecting Dr. Slack's evidence. (D.I. 15 at 7.) The ALJ gave little weight to the opinion of Johnson's physician, Dr. Slack. When Johnson visited Dr. Slack on November 4, 2011, he was told that he would need to be absent from work three or more days per month and was limited to jobs which allowed him to sit. (D.I. 9 at 547.) Only a few weeks later, on November 25, 2011, Johnson visited Dr. Slack to inform her about an issue with her latest treatment note, (*id.* at 554), but Dr. Slack insisted that the "'form was filled out correctly – he is not able to work in

construction *but he is not restricted from finding another occupation that does not require manual labor.*" (*Id.* at 555) (emphasis added). These conflicting reports troubled the ALJ, who articulated that Dr. Slack's opinions on November 25 were inconsistent with other reports. The ALJ felt the November 25 visit should have been accorded less weight "as there [was] no explanation for or documentation of findings that would support the change in opinion." (*Id.* at 36.) Furthermore, Johnson may have believed that he only had 4/5 power in his injured leg, but only a few months later in February of 2012, Mid-Atlantic Spine reported that Johnson had a coordinated and smooth gait with a cane, 5/5 muscle strength in all extremities, and normal muscle tone. (*Id.* at 598.)

The court finds that the ALJ was justified in discounting Dr. Slack's opinion based upon conflicts between her own opinions, and between her and other medical professionals. Due to various discrepancies between Dr. Slack's testimony and others, the ALJ was permitted to discount medical testimony that was "inconsistent with the other substantial evidence." *Fargnoli*, 247 F.3d at 43. Because the ALJ "must make the ultimate disability and RFC determinations" *Chandler*, 667 F.3d at 361, this court defers to the ALJ's determination that inconsistent reports from a physician may be proper grounds for discounting evidence. *See Fargnoli*, 247 F.3d at 43.

Although it is true that an ALJ may not choose to ignore limitations identified by a treating physician without an explanation, *see Fargnoli*, 247 F.3d at 43–44, the court finds that the ALJ provided a sufficient explanation, "as a reasonable mind might accept as adequate to support a conclusion." *Pierce*, 487 U.S. at 564–65. A reasonable mind would consider the clear discrepancy between telling a patient that he is limited to sedentary work, as opposed to telling a patient he may do anything besides manual labor. Thus, there was substantial evidence because

the ALJ adequately explained her discomfort with Dr. Slack's conflicting reports and lack of credibility.

## V. CONCLUSION

For the aforementioned reasons, the court concludes that: (1) the ALJ's denial of DIB and SSI is based on substantial evidence; (2) Johnson's motion for summary judgment is denied; and (3) the Commissioner's motion for summary judgment is granted.

Dated: July 13, 2016

_____
UNITED STATES DISTRICT JUDGE